IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

—————————————

YOLANDA PARKER;
JOHN SPRINGER JR.;
AND CHRIS ANDERSON,
QUALIFIED ELECTORS,
*Plaintiffs/Appellants/Cross-Appellees*,


*v.*


CITY OF TUCSON;
ROGER W. RANDOLPH,
IN HIS CAPACITY AS CITY CLERK FOR THE CITY OF TUCSON;
F. ANN RODRIGUEZ,
IN HER OFFICIAL CAPACITY AS PIMA COUNTY RECORDER;
JONATHAN ROTHSCHILD,
IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF TUCSON;
TUCSON CITY COUNCIL, A GOVERNING BODY;
REGINA ROMERO,
IN HER OFFICIAL CAPACITY AS MEMBER OF THE
TUCSON CITY COUNCIL;
PAUL CUNNINGHAM,
IN HIS OFFICIAL CAPACITY AS MEMBER OF THE
TUCSON CITY COUNCIL;
KARIN UHLICH,
IN HER OFFICIAL CAPACITY AS MEMBER OF THE
TUCSON CITY COUNCIL;
SHIRLEY SCOTT,
IN HER OFFICIAL CAPACITY AS MEMBER OF THE
TUCSON CITY COUNCIL;
RICHARD FIMBRES,
IN HIS OFFICIAL CAPACITY AS MEMBER OF THE
TUCSON CITY COUNCIL;
STEVE KOZACHIK,
IN HIS OFFICIAL CAPACITY AS MEMBER OF THE
TUCSON CITY COUNCIL;
PIMA COUNTY BOARD OF SUPERVISORS,
A POLITICAL SUBDIVISION OF THE STATE OF ARIZONA;
ALLY MILLER,

IN HER OFFICIAL CAPACITY AS MEMBER OF THE
PIMA COUNTY BOARD OF SUPERVISORS;
RAMON VALADEZ,
IN HIS OFFICIAL CAPACITY AS MEMBER OF THE
PIMA COUNTY BOARD OF SUPERVISORS;
SHARON BRONSON,
IN HER OFFICIAL CAPACITY AS MEMBER OF THE
PIMA COUNTY BOARD OF SUPERVISORS;
RAY CARROLL,
IN HIS OFFICIAL CAPACITY AS MEMBER OF THE
PIMA COUNTY BOARD OF SUPERVISORS;
RICHARD ELIAS,
IN HIS OFFICIAL CAPACITY AS MEMBER OF THE
PIMA COUNTY BOARD OF SUPERVISORS,
*Defendants/Appellees.*

COMMITTEE FOR SUSTAINABLE RETIREMENT
IN SUPPORT OF INITIATIVE PETITION 2013-I004
AND IN SUPPORT OF THE BALLOT MEASURE,
*Real Party in Interest/Appellee/Cross-Appellant.*

NO. 2 CA-CV 2013-0120
Filed November 19, 2013

Appeal from the Superior Court in Pima County
No. C20134029
The Honorable James E. Marner, Judge

**REVERSED AND REMANDED**

COUNSEL

Coppersmith Schermer & Brockelman PLC, Phoenix
By Andrew S. Gordon, Roopali H. Desai, John C. Kelly,
and Melissa A. Soliz

*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Gammage & Burnham P.L.L.C., Phoenix
By Lisa T. Hauser and Christopher L. Hering

*Counsel for Real Party in Interest/Appellee/Cross-Appellant*

---

**OPINION**

Presiding Judge Vásquez authored the opinion of the Court, in which Chief Judge Howard and Judge Kelly concurred.

---

V Á S Q U E Z, Presiding Judge:

**¶1**         In this expedited election appeal, Yolanda Parker, John Springer Jr., and Chris Anderson (jointly, the Employees)[1] challenge the trial court's September 3, 2013 order denying their request for injunctive and mandamus relief, entering judgment in favor of the Committee for Sustainable Retirement in Support of Initiative Petition 2013-I004 and in Support of the Ballot Measure (the Committee) and numerous government defendants,[2] and permitting the City of Tucson Initiative Petition 2013-I004 (the Initiative) to be placed on the

---

[1]Although Parker and Anderson are "currently employed by the City of Tucson," Springer is not.

[2]The Employees' complaint also named as defendants the City of Tucson, the Mayor and City Clerk of the City of Tucson, the Pima County Recorder, and members of the Tucson City Council and Pima County Board of Supervisors.  Those entities and individuals are not parties to this appeal.

November 5, 2013 ballot. Although the trial court invalidated some of the signatures obtained in support of the Initiative, it nevertheless found there were a sufficient number of valid signatures. In its cross-appeal, the Committee argues the court erred by disqualifying certain petition sheets and invalidating the corresponding signatures, permitting the Employees to amend their pleadings during trial, and denying the Committee's motion to dismiss the complaint as untimely.

**¶2**        By order dated September 12, 2013, this court reversed the judgment and remanded the case to the trial court with directions to enter an injunction pursuant to A.R.S. § 19-122(C) to prevent the Tucson City Clerk from "certifying or printing" the Initiative on the ballot, with a written opinion to follow.[3]  This is that opinion.

## FACTS AND PROCEDURAL BACKGROUND

**¶3**        The Committee is an unincorporated association and political committee organized for the purpose of promoting and sponsoring the Initiative, which sought to amend the Tucson City Charter to eliminate the City's non-public safety employee pension system. *See* A.R.S. § 16-902.01 (providing requirements for registration of political committees).  The Committee filed a statement of organization with the City, took out initiative petitions, and collected signatures that were submitted to the Tucson City Clerk and

---

[3]In its August 16, 2013 order, the trial court found certain petition sheets and signatures invalid and enjoined the defendants from placing the Initiative on the ballot until the parties performed various tasks and satisfied certain conditions set forth in the order. The Committee appealed that ruling and the Employees filed a notice of cross-appeal. This court stayed that appeal and revested jurisdiction in the trial court so that it could enter a final order in the case, which it did on September 3; the current appeal and cross-appeal have been taken from that ruling.  Pursuant to the parties' stipulation, we dismissed the initial cross-appeal on August 28 and dismissed the initial appeal as moot on September 18.

transmitted to the Pima County Recorder for verification, in order to place the Initiative on the City's November 5, 2013 ballot.[4]

¶4        The Committee hired political consulting firm Zimmerman Public Affairs, owned by Carol and Peter Zimmerman, to direct and monitor the campaign to qualify the Initiative for the ballot, hire petition circulators, and obtain petition signatures. On July 2, 2013, the Committee submitted to the City Clerk 1,857 petition signature sheets containing 23,364 signatures; 12,730 valid signatures were required to place the Initiative on the ballot. The deadline for printing ballots for the November 2013 election was September 16, 2013. The City Clerk issued an "Interim Facially Sufficient Petition Receipt" to the Committee, stating 22,693 signatures were "eligible for verification" under A.R.S. § 19-121.01(A), and transmitted the signatures to the Pima County Recorder for the requisite five-percent random sample. *See* § 19-121.01(B), (C). On July 16, 2013, the Pima County Recorder issued a certification stating it had received 1,135

---

[4]The provisions of A.R.S. § 19-101 and related statutes, including A.R.S. § 19-121.01(A), "shall apply to the legislation of cities, . . . [and] duties required of the secretary of state as to state legislation shall be performed in connection with such legislation by the city or town clerk . . . [or] officer in charge of elections." A.R.S. § 19-141(A). Section 19-121.01(A) provides that the city clerk has twenty business days to complete a facial review of the petitions submitted to determine the number of petition signatures "eligible for verification." Section 19-121.01(A)(1) requires the removal of petition sheets with a missing or incomplete circulator affidavit or if circulated by an individual prohibited from circulating petitions based on conviction of petition signature fraud. If a petition contains a missing signature, address, or date, § 19-121.01(A)(3) requires the removal of signatures. Section 19-121.01(A)(6) requires the city clerk to determine and issue a receipt for the number of signatures deemed "eligible for verification." And, § 19-121.01(B) and (C) prescribe the process through which selection is made at random five percent of the total signatures and copies of petitions bearing those signatures are transmitted to the county recorder for verification. Finally, A.R.S. § 19-121.02 prescribes the review process and deadline for the county recorder.

signatures for verification and "was able to verify 893 signatures versus 242 that were invalidated." That same day, the City Clerk issued a certificate stating the Initiative had sufficient signatures to qualify for the ballot.

¶5        On July 22, 2013, the Employees filed a complaint pursuant to § 19-122(C), an expedited challenge to the sufficiency of the Initiative, requesting an immediate trial and seeking injunctive and mandamus relief. They alleged certain petition sheets and individual signatures were invalid because nine of the circulators were ineligible to circulate petitions. They maintained that six of the circulators had prior felony convictions and were ineligible to register to vote and three were not registered as out-of-state petition circulators. The Employees also asserted some of the petitions were defective because they had been accompanied by incomplete circulator affidavits and that various individual signatures were invalid because they were incomplete or otherwise defective.

¶6        The trial court held an expedited evidentiary hearing pursuant to § 19-122(C) on August 2 and 6. In its August 16 ruling, the court entered preliminary findings of fact and conclusions of law. The court found that petitions circulated and signatures obtained by two of the circulators were defective because the circulators were convicted felons. It therefore concluded the 1,196 signatures those circulators had obtained were invalid. The court also found that 4,456 signatures were invalid because the signatures themselves were defective, either because they had been obtained by out-of-state circulators or because the accompanying circulator affidavit was false. The court ordered the City Clerk to remove the disqualified signatures, prepare a new random sample, and recalculate the projected number of valid signatures; it temporarily enjoined the City Clerk from placing the Initiative on the ballot.

¶7        Based on the new random sample and its having found 157 of the 853 signatures invalid, the Pima County Recorder calculated a new error rate of 18.4 percent. On September 3, the City Clerk issued a new certification after concluding the Initiative qualified for the ballot by 1,047 signatures. That same day, the trial court entered a final order that incorporated its August 16 order and took into account the City

Clerk's new tabulations and certification. The court invalidated 5,652 signatures: 4,857 signatures that had been collected by ineligible circulators, 794 signatures from defective petition sheets, and one signature that was defective on another specified sheet. Based on this determination and the error rate provided by the Pima County Recorder, the court found there were sufficient signatures to place the Initiative on the November 5, 2013 election ballot. This expedited appeal by the Employees and the Committee's cross-appeal followed. *See* Ariz. R. Civ. App. P. 8.1; § 19-122(C).

## DISCUSSION

### A. The Employees' Appeal

#### 1. Eligibility of Convicted Felons to Circulate Petitions

¶8 The Employees alleged in their complaint that Thomas Coombes, Daryl Oberg, Josephine Leonardi, James Greer, Mark Klepacki, and Gary Robinson were convicted felons who were not qualified to serve as petition circulators based on the requirements of A.R.S. § 19-112(D) because they were ineligible to register to vote according to the criteria established by the Arizona legislature. Specifically, they alleged the civil rights of these individuals had been suspended as a result of their convictions and had not been restored. The Committee stipulated Klepacki had been convicted of felonies in Florida and that his civil rights had not been restored. The court found there was clear and convincing evidence Greer also was not qualified to circulate petitions as a consequence of his felony convictions. Thus, the court found the signatures Greer and Klepacki had obtained were invalid.

¶9 The trial court found there was no evidence establishing Coombes, Oberg, or Leonardi had applied for a restoration of the civil rights suspended because of their felony convictions. Nevertheless, it determined all three were eligible to vote in the states where they had been convicted of felonies—California, Ohio, and Illinois—and, consequently, they were eligible to serve as circulators in Arizona.

¶10 The Employees argue on appeal that eligibility to vote in another state is insufficient and that the three individuals were not qualified to serve as circulators in Arizona because their civil rights had not been fully restored. The Employees maintain that, had the trial court correctly invalidated the signatures collected by these individuals, the court necessarily would have found the Committee had failed to submit the requisite 12,730 signatures to place the Initiative on the November 2013 ballot. The Employees also assert that, in addition to "confusi[ng] . . . the restoration of civil rights and the restoration of voting rights," the court erred by (1) "fail[ing] to shift the burden of production to [the Committee] to prove restoration of civil rights once [the Employees] demonstrated that Coombes, Oberg, and Leonardi were convicted felons," and, (2) requiring the Employees to meet that burden with clear and convincing evidence rather than a preponderance of the evidence.

¶11 We review a trial court's decision on a request for injunctive or mandamus relief under § 19-122 for an abuse of discretion. *Harris v. City of Bisbee*, 219 Ariz. 36, ¶ 13, 192 P.3d 162, 165 (App. 2008). An abuse of discretion includes an error of law. *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, ¶ 58, 181 P.3d 219, 236 (App. 2008). We review de novo the legal question of whether the court applied the proper burden of proof. *Am. Pepper Supply Co. v. Fed. Ins. Co.*, 208 Ariz. 307, ¶ 8, 93 P.3d 507, 509 (2004). And when, as here, an issue involves the interpretation of a statute, it is a question of law we review de novo. *Harris*, 219 Ariz. 36, ¶ 13, 192 P.3d at 165-66; *see also Open Primary Elections Now v. Bayless*, 193 Ariz. 43, ¶ 9, 969 P.2d 649, 652 (1998); *State Comp. Fund v. Yellow Cab Co. of Phx.*, 197 Ariz. 120, ¶ 5, 3 P.3d 1040, 1042 (App. 1999).

¶12 Our primary purpose in interpreting a statute is to give effect to the legislature's intent. *See Sierra Tucson, Inc. v. Lee*, 230 Ariz. 255, ¶ 9, 282 P.3d 1275, 1278 (App. 2012). Because the plain language of a statute is the best reflection of that intent, when a statute is clear and unambiguous we need look no further than the statute's terms to determine its meaning and do not employ other principles of statutory construction. *Id.; see also In re Wilputte S.*, 209 Ariz. 318, ¶ 10, 100 P.3d 929, 931 (App. 2004). And, "we assume that when the legislature uses different language within a statutory scheme, it does so with the intent

of ascribing different meanings and consequences to that language." *Comm. for Pres. of Established Neighborhoods v. Riffel*, 213 Ariz. 247, ¶ 8, 141 P.3d 422, 424-25 (App. 2006).

**¶13** The same principles of construction apply when interpreting provisions of Arizona's constitution. Thus, our goal is "to effectuate the intent of those who framed the provision." *Jett v. City of Tucson*, 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994). If the language of a provision of the constitution is "unambiguous, we generally must follow the text as written." *Tumacacori Mission Land Dev., Ltd. v. Union Pac. R.R. Co.*, 228 Ariz. 100, ¶ 6, 263 P.3d 649, 651 (App. 2011). When the words are plain and clear, "'judicial construction is neither necessary nor proper,' and we will not consider any extrinsic matter supporting a construction that would vary the provision's apparent meaning." *Id.*, *quoting Jett*, 180 Ariz. at 119, 882 P.2d at 430.

**¶14** In addition to these basic principles of construction and review, we are equally mindful of special principles regarding the interpretation and application of the portions of the Arizona Constitution and statutes pertaining to initiatives and the initiative process. *See* Ariz. Const. art. IV, pt. 1, § 1(1), (2). "Arizona has a strong policy [of] supporting the people's exercise of" the power granted to them by the constitution "to propose laws through initiative process." *Pedersen v. Bennett*, 230 Ariz. 556, ¶ 7, 288 P.3d 760, 762 (2012). Thus, "courts liberally construe initiative requirements and do not interfere with the people's right to initiate laws 'unless the Constitution expressly and explicitly makes any departure [from initiative filing requirements] fatal.'" *Id.*, *quoting Kromko v. Superior Court*, 168 Ariz. 51, 58, 811 P.2d 12, 19 (1991) (alteration in *Pedersen*).

**¶15** Because of these underlying policies, "once initiative petitions are circulated, signed and filed, they are presumed valid." *Harris v. Purcell*, 193 Ariz. 409, ¶ 15, 973 P.2d 1166, 1169 (1998). Thus, although § 19-122(C) expressly authorizes a citizen to bring an action challenging the legal sufficiency of an initiative petition and/or signatures, in interpreting the requirements imposed by the constitution or a statute, "courts must exercise restraint before imposing unreasonable restrictions on the people's legislative authority." *Kromko*, 168 Ariz. at 57, 811 P.2d at 18. "The term 'legal

sufficiency,' as used in § 19-122(C), requires substantial, not necessarily technical, compliance with the requirements of the law." *Id.* at 58, 811 P.2d at 19 (citations omitted); *see also Feldmeier v. Watson*, 211 Ariz. 444, ¶ 14, 123 P.3d 180, 183 (2005) (test for initiatives, unlike referenda, is whether petition substantially complies with requirements of constitution and statute). "Courts may remove a measure from the ballot only 'when it appears affirmatively the constitutional and statutory rules in regard to the manner in which initiative . . . petitions should be submitted have been so far violated that there has been no substantial compliance therewith . . . .'" *Kromko*, 168 Ariz. at 58, 811 P.2d at 19, *quoting Iman v. Bolin*, 98 Ariz. 358, 366, 404 P.2d 705, 710 (1965) (alterations in *Kromko*). With all of these principles in mind, we now turn to the statutes and provisions of the constitution implicated here.

**¶16** Section 19-114, A.R.S., which disqualifies certain individuals from serving as petition circulators, provides in subsection (A), "no person other than a person who is qualified to register to vote pursuant to [A.R.S.] § 16-101 may circulate an initiative or referendum petition and all signatures verified by any such person shall be void and shall not be counted in determining the legal sufficiency of the petition." *See also Tucson City Code* §§ 12-54(b), 12-58(a)(1). Section 16-101 sets forth the criteria that qualify a person to register to vote, providing in subsection (A)(5) that a person is qualified if he or she "[h]as not been convicted of . . . a felony, unless restored to civil rights." The parallel provision in the Arizona Constitution expressly disqualifies certain persons from serving as an elector, stating, "nor shall any person convicted of . . . [a] felony, be qualified to vote at any election unless restored to civil rights." Ariz. Const. art. VII, § 2(C). "A person is presumed to be properly registered to vote [in Arizona] on completion of a registration form as prescribed by [A.R.S.] § 16-152," but that presumption may be rebutted by clear and convincing evidence. A.R.S. § 16-121.01.

**¶17** Based on the plain language of § 16-101(A)(5), and article VII, § 2(C) of the Arizona Constitution, a person is not qualified to register to vote in Arizona if the person has been convicted of a felony, unless his or her civil rights have been restored. *See Rocking K Holdings, Ltd. v. Pima Cnty.*, 170 Ariz. 134, 136, 822 P.2d 487, 489 (App. 1991).

Because there is nothing ambiguous or unclear about the statute or the constitution, we "must follow the text as written." *Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co.*, 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994); *see also Jett*, 180 Ariz. at 119, 882 P.2d at 430 (requiring court to follow plain language of constitutional provisions unless terms ambiguous or unclear). Section 19-114(A) specifies the person must be "qualified to register to vote pursuant to § 16-101." And § 16-101(A)(5), like article VII, § 2(C) of the Arizona Constitution, could not be more clear: a person who has been convicted of a felony is not qualified to register to vote unless that person's civil rights have been restored.

¶18 The Committee relies on A.R.S. § 13-912(A) in arguing a literal application of the clear terms in § 16-101 would result in an absurdity. Section 13-912 applies to first-time felony offenders and provides for the automatic restoration of any civil rights "lost or suspended by the conviction," except the right to possess a gun or firearm upon completion of the sentence or probation and payment of any outstanding fines or restitution.[5] *See Rocking K Holdings, Ltd.*, 170 Ariz. at 136, 822 P.2d at 489 (§ 13-912 provides for automatic restoration of rights of first-time felony offenders but inapplicable when person convicted of more than one felony, even if convictions on same occasion; other convicted felons must apply for restoration of rights before eligible to circulate referendum petition). Section 13-904(A), A.R.S., specifies the rights that are suspended upon conviction of a felony, of which the right to vote is only one: the right to vote, the right to hold public office of trust or profit, the right to serve as a juror, and the right to possess a gun or other firearm.

¶19 The Committee contends that construing § 19-114(A) and § 16-101(A)(5) to mean restoration of all civil rights instead of restoration of the right to vote only is contrary to the most "sensibl[e]" interpretation of these statutes when they are considered together and in context and "utterly eviscerates and defeats the Legislature's goal of automatically restoring a first-time felon's right to vote," as expressed

---

[5]In order to regain the right to possess a gun or firearm, a convicted felon must apply for such restoration in the superior court in the county where the conviction occurred. *See* A.R.S. §§ 13-905, 13-906.

in § 13-912(A). The Committee asks this court to disregard the plain language of both § 19-114(A) and § 16-101(A)(5), as well as the Arizona Constitution. The Committee argues, too, that although the restoration statutes vary from state to state, if we were to construe Arizona's statutes in a manner consistent with its plain language, a person might be eligible to register to vote in the state where his or her conviction occurred but would be "disenfranchised in Arizona," a result the Committee characterizes as "absurd."[6]

**¶20** We find these arguments unpersuasive. As we stated previously, when the legislature's intent is reflected in plain and unambiguous language, we need not and, indeed, should not employ other principles of construction to determine the legislature's intent. *See Winterbottom v. Ronan*, 227 Ariz. 364, ¶ 5, 258 P.3d 182, 183-84 (App. 2011). We will not rewrite statutes to effectuate a meaning different than the one the legislature intended. *See State v. Gonzalez*, 216 Ariz. 11, ¶ 10, 162 P.3d 650, 653 (App. 2007); *see also State v. Tarango*, 185 Ariz. 208, 210-11, 914 P.2d 1300, 1302-03 (1996) (courts must follow plain, unambiguous text and may not "rewrite statutes"); *State v. Patchin*, 125 Ariz. 501, 502, 610 P.2d 1062, 1063 (App. 1980) ("[T]his court is not at liberty to rewrite the statute under the guise of judicial interpretation."). The Committee is correct that we will not apply clear terms of a statute literally if the result would be absurd. *See Winterbottom*, 227 Ariz. 364, ¶ 5, 258 P.3d at 183 ("If the language of those provisions is clear, [it is] the best indicator of the authors' intent and as a matter of judicial restraint we 'must apply it without resorting to other methods of statutory interpretation, unless application of the plain meaning would lead to impossible or absurd results.'"), *quoting N. Valley Emergency Specialists, L.L.C. v. Santana*, 208 Ariz. 301, ¶ 9, 93 P.3d 501, 503 (2004) (internal citation omitted); *Reeves v. Barlow*, 227 Ariz. 38, ¶ 12, 251 P.3d 417, 420 (App. 2011) (clear and unambiguous language of statute normally conclusive evidence of meaning unless there is express evidence of contrary legislative intent or application of

---

[6]Contrary to the Committee's suggestion, this case does not involve the issue whether the particular convicted felons are being disenfranchised from eligibility to vote. Rather, here, we address only whether they are qualified under Arizona law to circulate petitions.

such language results in impossible or absurd consequences). But we disagree with the Committee's contention that the results of applying the terms "civil rights" literally to mean all civil rights, not just the right to register to vote, would be absurd or nonsensical.

¶21 The Arizona legislature has imposed upon convicted felons a standard for the restoration of the felon's civil rights that is, perhaps, more stringent than the standard imposed by other states in requiring a convicted felon to have all civil rights restored before the person may be eligible to register to vote and, consequently, eligible to serve as a petition circulator. *See* Jean Chung, The Sentencing Project, *Felony Disenfranchisement: A Primer* (June 2013), *available at* http://sentencingproject.org/doc/publications/fd_Felony%20Disen franchisement%20Primer.pdf. It is the legislature's prerogative to impose strict requirements for petition circulators. *See generally Arizona v. Inter Tribal Council of Ariz., Inc.*, ___ U.S. ___, ___, 133 S. Ct. 2247, 2257-58 (2013) (recognizing states have power to establish voting requirements). And the legislature's decision—as clearly evinced by the plain language of the relevant statutes—cannot reasonably be characterized as absurd.

¶22 Section 13-912(A), by its plain language, applies only to first-time felony offenders whose convictions occurred in Arizona and, with the exception of the right to possess firearms, "restore[s] any civil rights" to those offenders. That the legislature has provided an automatic restoration of certain civil rights for first-time felony offenders under Arizona law does not make § 13-912(A) incompatible with § 16-101(A)(5).[7] Rather, it merely provides that those convicted of multiple felonies in Arizona or whose convictions occurred in other jurisdictions will not benefit from the narrow provision the legislature has created for Arizona first-time offenders.

---

[7]We need not decide today whether the legislature's requirement that even first-time felony offenders must apply separately for the restoration of the right to possess a gun or firearm renders the person ineligible to register to vote in Arizona; that is not the issue in this case.

¶23        Thus, we hold that in order to circulate initiative petitions in Arizona, the circulator's civil rights must have been restored by the state in which he or she was convicted.[8] *Cf. State v. Prince*, 226 Ariz. 516, ¶ 40, 250 P.3d 1145, 1159 (2011) ("A juror convicted of an out-of-state felony whose civil rights have not been restored is disqualified from jury service by [A.R.S.] § 21-201(3).").

## 2.        Employees' Burden of Proof

¶24        The trial court preliminarily determined that the Employees had the burden to prove by clear and convincing evidence that the petition sheets and signatures were legally insufficient. *See Blaine v. McSpadden*, 111 Ariz. 147, 149, 526 P.2d 390, 392 (1974). The Employees contend they were only required to prove by a preponderance of the evidence that Coombes, Oberg, and Leonardi were not qualified to serve as petition circulators. They argue the heightened standard in the election context only applies, pursuant to § 16-121.01, to rebut the presumption that a person who has completed the registration form is properly registered to vote in Arizona. We need not address this issue or the related question whether the court erred in not shifting the burden to the Committee to establish the circulators' civil rights had been restored after the Employees presented prima facie evidence that they had been convicted of a felony, resulting in the suspension of those rights, and the absence of evidence that those rights had been restored. Even assuming, without deciding, the heightened standard of proof applies and the Employees must demonstrate the circulators' civil rights had not been restored, they sustained that burden. The Employees presented clear and convincing evidence that Coombes and Oberg had been convicted of

---

        [8]We need not resolve the question whether a person with a felony conviction in another state whose civil rights had been fully restored except the right to own or possess weapons would be eligible to serve as a petition circulator. Although the Committee insists the only right that must be restored is the right to vote, it agrees that the restoration of rights is determined by the law of the jurisdiction in which the conviction occurred and the rights consequently were suspended.

felonies and, although their rights to register to vote under the law of the states where their convictions occurred were restored by operation of law, the Employees demonstrated their remaining civil rights had not been fully restored.[9]

### 3. Eligibility of Circulator Coombes

**¶25** The record establishes and the trial court found that Thomas Coombes had been convicted of "two drug-related felonies in Orange County, California on July 25, 2000."[10] The court further found Coombes had been sentenced to a sixteen-month prison term; the Orange County Superior Court docket reflected the case had been closed, "at the latest, on March 9, 2008"; and Coombes subsequently had been convicted of misdemeanors. The court concluded that, based

---

[9]We further observe that the Committee plainly had superior access to information about the restoration of the circulators' civil rights and chose to produce no such evidence. As the Employees point out, there is support for the notion that a party with superior knowledge about and access to evidence regarding certain facts should bear the burden of producing that evidence, rather than charging the adverse party with the task of proving a negative. *See, e.g.*, *Woerth v. City of Flagstaff*, 167 Ariz. 412, 419, 808 P.2d 297, 304 (App. 1990).

[10]The Committee asserts in its answering brief that it objected to the use of uncertified court documents to establish these prior felony convictions. But the Committee does not meaningfully develop an argument in its answering brief or opening brief of its cross-appeal that the admission of this evidence was error. Thus, the argument is waived on appeal, and we view the evidence as properly admitted and, consequently, the fact of the convictions essentially undisputed. *See* Ariz. R. Civ. App. P. 13(a)(6) (brief shall contain arguments with "citations to the authorities, statutes and parts of the record relied on"); *Polanco v. Indus. Comm'n*, 214 Ariz. 489, n.2, 154 P.3d 391, 393 n.2 (App. 2007) (finding issue waived on appeal because party mentioned it in passing, cited no supporting legal authority, and failed to develop it further); *cf. State v. McGann*, 132 Ariz. 296, 299, 645 P.2d 811, 814 (1982) (noting majority rule "that if hearsay evidence is admitted without objection, it becomes competent evidence admissible for all purposes").

on California law, the passage of time, and the absence of evidence to suggest Coombes still was on parole, he was eligible to register to vote in California. Consequently, the court reasoned, he is eligible to register to vote in Arizona for purposes of § 19-114(A) and § 16-101(A)(5) and was qualified to circulate initiative petitions.

¶26 The parties do not dispute that under California law, the civil rights of a person convicted of a felony are automatically suspended. *See generally* Cal. Penal Code § 2600(a) ("A person sentenced to imprisonment in a state prison . . . may during that period of confinement be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests."); *see also* Cal. Const. art. II, § 4 (requiring legislature to "prohibit improper practices that affect elections and . . . provide for the disqualification of electors while . . . imprisoned or on parole for the conviction of a felony"). The California legislature has specified those rights that cannot be restored in the absence of a full pardon. For example, a convicted felon "whose civil rights have not been restored" is not eligible to serve on a jury. Cal. Civ. Proc. Code § 203(a)(5). And without a general pardon, "[a]ny person who has been convicted of a felony" is "disqualified from holding office as a peace officer or being employed as a peace officer" and is "disqualified from any office or employment by the state, county, city, city and county or other political subdivision, . . . which confers upon the holder or employee the powers and duties of a peace officer." Cal. Gov't Code § 1029(a)(1). Similarly, under Cal. Gov't Code § 1029(c):

> Any person who has been convicted of a felony, other than a felony punishable by death, . . . and who demonstrates the ability to assist persons in programs of rehabilitation may hold office and be employed as a parole officer of the Department of Corrections or the Department of the Youth Authority, or as a probation officer in a county probation department, if he or she has been granted a full and unconditional pardon . . . .

16

¶27        Under California law, a convicted felon may seek restoration of all civil rights suspended by a felony conviction by filing a petition for rehabilitation and pardon in the court where the conviction occurred.  Cal. Penal Code § 4852.01.  Subsection (a) of Cal. Penal Code § 4852.01 provides:

> Any person convicted of a felony who has been released from a state prison or other state penal institution or agency in California, whether discharged on completion of the term for which he or she was sentenced or released on parole prior to May 13, 1943, who has not been incarcerated in a state prison or other state penal institution or agency since his or her release and who presents satisfactory evidence of a three-year residence in this state immediately prior to the filing of the petition for a certificate of rehabilitation and pardon provided for by this chapter, may file the petition pursuant to the provisions of this chapter.

If granted, the court's recommendation is sent to the Governor of the State of California for a full pardon.  *See* Cal. Penal Code § 4852.13(a). If the convicted felon obtains a full pardon, he or she is restored to a variety of rights suspended by the conviction, including the right to vote, Cal. Penal Code § 4852.17, the right to possess a firearm, under certain circumstances, Cal. Penal Code § 4854, the right to apply for licensing by the state's various professional and occupational licensing boards, Cal. Penal Code § 4853, the right to serve on a jury, Cal. Civ. Proc. Code § 203(a)(5), and the right to apply for a position as a county probation officer or state parole agent, Cal. Gov. Code § 1029(c).  The fact that a person's right to vote under Cal. Elec. Code §§ 2201, 2212, or even the right to hold public office, has been restored by operation of law does not permit the inference that the person's civil rights, including the right to serve on a jury, have been fully restored.  *See United States. v. Horodner*, 91 F.3d 1317, 1319 (9th Cir. 1996) (noting that "defendant's civil rights were not substantially restored because he

was barred from serving on a jury, even though he could vote and hold office").

¶28 Additionally, Cal. Penal Code § 4852.17 states that various agencies and courts are to receive notice of the certification of rehabilitation and pardon, providing as follows:

> Whenever a person is issued a certificate of rehabilitation or granted a pardon from the Governor under this chapter, the fact shall be immediately reported to the Department of Justice by the court, Governor, officer, or governmental agency by whose official action the certificate is issued or the pardon granted. **The Department of Justice shall immediately record the facts so reported on the former criminal record of the person,** and transmit those facts to the Federal Bureau of Investigation at Washington, D.C. When the criminal record is thereafter reported by the department, it shall also report the fact that the person has received a certificate of rehabilitation, or pardon, or both.

(Emphasis added.)

¶29 Don Vogel, a private investigator hired by the Employees, testified about his investigation of certain circulators and their criminal histories as reflected in various state records. With respect to Coombes, Vogel testified that, after discovering Coombes had been convicted of two felonies in July 2000, he attempted to find out if Coombes's civil rights had been restored in California. Vogel stated he had "found no evidence that they were restored" and had checked the "Orange County Superior Court docket for any information in the original case or in any follow-up documents indicating that the process had been started or completed." Thus, after looking in precisely the place where any pardon or certificate of rehabilitation would have been, Vogel found no evidence that Coombes's rights had been

restored. This constitutes clear and convincing evidence that Coombes is a convicted felon whose civil rights have not been fully restored. The Employees therefore sustained their burden of establishing under any standard of proof applicable in a civil proceeding that Coombes was ineligible to circulate initiative petitions pursuant to § 19-114(A).

¶30 As we stated previously, statutory requirements for initiatives must be liberally construed, and compliance need only be substantial. *See Pedersen*, 230 Ariz. 556, ¶ 7, 288 P.3d at 762. Based on the evidence introduced at the hearing, particularly Vogel's testimony, the Employees established a lack of substantial compliance with § 19-114(A), § 16-101(A)(5), and article VII, § 2(C) of the Arizona Constitution by showing Coombes was a convicted felon whose civil rights had not been restored.[11]

### 4. Eligibility of Circulator Oberg

¶31 We reach the same conclusion with respect to Daryl Oberg. Oberg pled guilty to one count of grand theft in Cuyahoga County, Ohio, in 1994, and was sentenced to a one-year prison term; that term was suspended pending Oberg's completion of a two-year term of probation and payment of restitution. The trial court concluded Oberg was eligible to vote in Ohio because "his ability to register as a voter was restored after completion" of his probationary term and there had been a "significant passage of time since Mr. Oberg's conviction" and there was no evidence that "his file remains open."

---

[11]Because these statutes and the Arizona Constitution require such specific criteria for convicted felons who wish to circulate petitions, arguably the lack of compliance is, for all practical purposes, expressly "fatal," warranting technical and strict compliance rather than mere substantial compliance. *Pedersen*, 230 Ariz. 556, ¶ 7, 288 P.3d at 762. But, having established a lack of substantial compliance, the Employees clearly showed the Committee did not satisfy the requirements of the statutes and the constitution under a more technical review and even the requirement of strict compliance.

**¶32** Under Ohio law, a person convicted of a felony "is incompetent to be an elector or juror or to hold an office of honor, trust, or profit." Ohio Rev. Code Ann. § 2961.01(A)(1). Subsection (A)(2) of that statute provides that a person whose civil rights have been suspended because of a felony conviction is competent to be an elector if "granted parole, judicial release, or a conditional pardon or is released under a non-jail community control sanction or a post-release control sanction." A "full pardon" restores the remainder of the rights and privileges specified in subsection (A)(1). Ohio Rev. Code Ann. § 2961.01(A)(2). So, too, does an order of expungement. *See* Ohio Rev. Code Ann. § 2953.33(A) (providing expungement order restores "all rights and privileges not otherwise restored by termination of the sentence or community control sanction or by final release on parole or post-release control").

**¶33** A full pardon or commutation must be sought pursuant to Ohio Rev. Code Ann. § 2967.07. *See also* Ohio Rev. Code Ann. § 2967.01(B) ("'Pardon' means the remission of penalty by the governor in accordance with the power vested in the governor by the constitution."). The governor may grant the pardon or commutation "upon such conditions precedent or subsequent as the governor may impose." Ohio Rev. Code Ann. § 2967.04(A). An unconditional pardon, which includes "a conditional pardon with respect to which all conditions have been performed or have transpired," also "relieves the person to whom it is granted of all disabilities arising out of the conviction or convictions from which it is granted." Ohio Rev. Code Ann. § 2967.04(B). Significantly, Ohio Rev. Code Ann. § 2967.04(A) provides that a pardon or commutation does not take effect until the convicted felon accepts any conditions, attested to by one witness who

> shall go before the clerk of the court of common pleas in whose office the sentence is recorded and prove the signature of the convict. The clerk shall thereupon record the warrant, indorsement, and proof in the journal of the court, which record, or a duly certified transcript thereof, shall be evidence of such pardon or commutation, the

conditions thereof, and the acceptance of the
conditions.

¶34 Thus, if Oberg had sought or been granted a full pardon, the pardon or application for pardon would have been in the record of the court where his conviction occurred. *See State ex rel. Gains v. Rossi*, 716 N.E.2d 204, 207-08 (1999) (convicted felon's right to hold public office can be restored only through pardon or expungement processes and is not automatically restored by "termination of sentence or probation or by final release on parole"). Vogel investigated the restoration of Oberg's civil rights by asking the court in which the conviction had occurred whether Oberg had applied for such a restoration and was told the court had no information establishing his civil rights had been restored. Had Oberg's civil rights been fully restored, Vogel would have found that information in the records of the court of conviction. Thus, the evidence established a lack of compliance with the requirements of § 19-114(A), § 16-101(A)(5), and article VII, § 2(C) of the Arizona Constitution based on the evidence that Oberg had been convicted of a felony and his civil rights had not been restored.

¶35 For the foregoing reasons, we conclude the trial court erred in finding that Coombes and Oberg were qualified to circulate initiative petitions under Arizona law. Thus, pursuant to § 19-121.01(A)(1)(g), the 2,978 signatures collected by Coombes and Oberg are invalid. After subtracting those signatures and taking into account the error rate provided by the Pima County Recorder, the Committee falls far short of the 12,730 valid signatures required to place the Initiative on the ballot.

### 5. Eligibility of Circulator Leonardi

¶36 Vogel testified, with respect to Josephine Leonardi, that she had been convicted in Carroll County, Illinois, in 2001 of possession of methamphetamine, a class-two felony. Vogel testified further that he had investigated whether Leonardi's civil rights had been restored and, based on his communication with the rural county in Illinois where the conviction had occurred, there was no such information. But, for the reasons discussed below, because we reject

the issues raised in the Committee's cross-appeal, we need not address whether, by operation of the law of Illinois, Leonardi's civil rights, including but not limited to her right to register to vote, were restored.[12]   Even assuming the 476 signatures she collected were properly considered, the Committee did not collect sufficient signatures to qualify the Initiative for the ballot.

## B.      The Committee's Cross-Appeal

¶37          In its cross-appeal[13] from the trial court's ruling, the Committee argues:    (1) there was no legal basis for the court to

_____

[12]A person convicted of a felony "shall be ineligible to hold an office created by the Constitution of this State until the completion of his sentence" and that "[a] person sentenced to imprisonment shall lose his right to vote until released from imprisonment."  730 Ill. Comp. Stat. 5/5-5-5(b), (c).  Other civil rights are suspended as well, as provided in the state's election code.  730 Ill. Comp. Stat. 5/5-5-5(a).  Section 5/5-5-5(d) provides, however, that, except with regard to the suspension or revocation of a person's driver license, all license rights and privileges are restored once the person is released from prison or discharged from probation, "unless the authority having jurisdiction of such license rights finds after investigation and hearing that restoration is not in the public interest."  We note, however, that under Illinois law, "[i]t is unlawful for a person to knowingly possess . . . any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction."  720 Ill. Comp. Stat. 5/24-1.1(a).  That right may be restored only upon application to the director of the Department of State Police.  *See* 430 Ill. Comp. Stat. 65/10(c).

[13]It was not necessary for the Committee to file a cross-appeal. None of the issues raised would "enlarge the rights of the appellee or . . . lessen the rights of the appellant" and instead only offer alternative means to affirm the trial court's judgment in favor of the Committee. Ariz. R. Civ. App. P. 13(b)(3).  We nonetheless treat the Committee's claims as cross-issues and address their merits.  *See Town of Miami v. City of Globe*, 195 Ariz. 176, n.1, 985 P.2d 1035, 1036 n.1 (App. 1998) (addressing claims improperly raised on cross-appeal as cross-issues).

disqualify petition sheets circulated by non-resident circulators; (2) insufficient evidence supported the court's finding that circulators Stephen Laws, Renee Gordon, and Louise Breneiser were not Arizona residents; (3) the court erred in disqualifying an additional sixty petition sheets because the errors were merely technical; (4) the court erred by permitting the Employees to amend their pleadings during trial to include an argument that a circulator was not an Arizona resident; and, (5) the court erred in denying the Committee's motion to dismiss the complaint as untimely. We address each argument in turn.

### 1. Non-Resident Circulators

¶38 The Employees alleged in their complaint, and the trial court found, that three circulators—Stephen Laws, Renee Gordon, and Louise Breneiser—did not live in Arizona and had not registered with the Secretary of State as out-of-state circulators as required by § 19-112(C). The court thus disqualified the petition sheets circulated by those circulators. The Committee argues on appeal the court had no authority to do so because the legislature did not provide disqualification as a penalty for noncompliance with § 19-112(C). In our discretion, we decline to address this argument because the Committee did not raise it below. *See Airfreight Express Ltd. v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, ¶ 17, 158 P.3d 232, 238-39 (App. 2007) (arguments raised for first time on appeal generally waived).

¶39 The Committee further argues the trial court erred in concluding there was clear and convincing evidence that Laws, Gordon, and Breneiser were not Arizona residents.[14] Evidence is clear and convincing if it makes "'the thing to be proved . . . highly probable or reasonably certain.'" *Kent K. v. Bobby M.*, 210 Ariz. 279, ¶ 25, 110 P.3d 1013, 1018-19 (2005), *quoting Black's Law Dictionary* 577 (7th ed. 1999). We will affirm the court's determination unless it is clearly erroneous. *See Rowland v. Great States Ins. Co.*, 199 Ariz. 577, ¶ 33, 20 P.3d 1158, 1168 (App. 2001).

[14]The Employees assert they were only required to demonstrate the circulators' non-residence by a preponderance of the evidence. Because we determine there was clear and convincing evidence of non-residence, we do not address this argument.

¶40        Section 19-112(C) requires that "[c]irculators who are not residents of this state must be registered as circulators with the secretary of state before circulating petitions."  Arizona election law provides that a resident is a person who has "actual physical presence in this state . . . combined with an intent to remain."  § 16-101(B).  "A temporary absence," however, "does not result in a loss of residence if the individual has an intent to return following his [or her] absence." *Id.*  The Committee first suggests the trial court erred because it did not expressly examine the factors listed in A.R.S. § 16-593 and should have considered "where the individual's family resides" while a person is absent from the state and "[w]here the person's children go to school." We reject this argument.  Section 16-593 relates only to the scope of examination conducted by the election board pursuant to a challenge to an individual elector's residence pursuant to A.R.S. §§ 16-591 and 16-592.  It does not purport to create a list of factors a trial court must consider in determining a person's residence.  Although the factors listed in § 16-593 may be relevant to the court's decision, the absence of evidence related to specific factors does not require the court to conclude the person is a resident.

## 2.    Eligibility of Circulator Laws

¶41        In finding Laws was not an Arizona resident, the trial court noted he had provided two addresses for his residence in Arizona.  One address is a high-rise apartment complex, but at the other address there is no residence or structure of any kind.  The court also noted Vogel's testimony that the complex manager[15] did not know Laws, had told Vogel that Laws did not receive mail there, and had checked the complex's computer database listing the name of residents

_____

[15]To the extent the Committee challenges the testimony of the complex manager as inadmissible hearsay, it does not adequately develop this argument, and we do not consider it further.  *See* Ariz. R. Civ. App. P. 13(a)(6) (brief shall contain arguments with "citations to the authorities, statutes and parts of the record relied on"); *Polanco v. Indus. Comm'n*, 214 Ariz. 489, n.2, 154 P.3d 391, 393 n.2 (App. 2007) (finding issue waived on appeal because party mentioned it in passing, cited no supporting legal authority, and failed to develop it further).

without finding an entry for Laws. Additionally, the court observed, Andrew Chavez—the owner of a petition-circulating company—testified that he knew Laws, that Laws traveled from state to state as a circulator, and that Laws would have described his state of residence as either Ohio or California. Chavez additionally testified Laws had arrived in Arizona just before he began circulating signature sheets and had left the day after the sheets were submitted.

¶42 The Committee argues there was insufficient evidence that Laws was not a resident because he had been registered to vote in Maricopa County since 2007 and because Vogel "false[ly] assum[ed]" that Laws lived alone at the apartment complex, thus explaining why he was not listed in the complex's registry. The Committee further asserts Chavez's testimony that Laws "travels from one temporary location to another in his work as a petition circulator has no legal bearing on his residence." We disagree, particularly in light of the dearth of evidence connecting Laws with the apartment address he had provided and Chavez's testimony that Laws would not characterize himself as an Arizona resident. In short, the trial court reasonably could conclude Laws did not live at the address he had listed. The Committee essentially is asking us to reweigh the evidence, which we will not do. *See Pro Finish USA, Ltd. v. Johnson*, 204 Ariz. 257, ¶ 23, 63 P.2d 288, 294 (App. 2003).

### 3. Eligibility of Circulator Gordon

¶43 The Committee further argues the trial court erred in finding Gordon was a non-resident because "[t]he record is devoid of any evidence" about her residency, noting that Vogel did not investigate her. The court concluded Gordon was a non-resident, observing that Chavez had testified she had traveled with Laws to circulate petitions and had left with him. Thus, the Committee reasons, the court improperly disqualified Gordon based on her "association" with Laws. But the Committee again discounts Chavez's testimony, which the court found credible. Although Chavez acknowledged he did not know Gordon "personally," he testified that he knew of her, was familiar with her residency status, knew she did not live at the address she had listed, and knew she and Laws were in a relationship and travelled together. And Gordon provided the same address as

25

Laws on her petition signature sheet, despite there being no evidence she lived at that address and only limited evidence tying Laws to that address. This amply supports the court's conclusion that Gordon was not an Arizona resident.

### 4. Eligibility of Circulator Breneiser

¶44 Finally, the Committee contends the trial court erred in finding Breneiser a non-resident based solely on the fact that she had filed a non-resident registration form for another election with the Secretary of State approximately forty-five days before the Initiative was assigned a serial number from the City Clerk. The Committee speculates that "[a] lot could have happened in that period of time" and that Brenheiser "may well have decided to re-establish residency in Arizona after" filing the registration form. We cannot agree with the Committee that, in light of plain evidence that Brenheiser was not a resident in April, the court could not conclude she also was not a resident in May.

### 5. Additional Disqualified Signature Sheets

¶45 The Committee next asserts the trial court erred by excluding signature sheets based on faults in the accompanying circulator's affidavit—specifically, that the circulator had avowed that "each individual [signer] printed the individual's own name and address" when the evidence showed that someone other than the signer had done so. The Committee argues that, pursuant to § 19-121.01(A)(3)(f), the court was permitted to remove only the defective entries and had no authority to disqualify the entire petition sheet. It further argues, in the alternative, that the defective entries constituted only "technical" violations that did not warrant disqualification of the entire sheet. Whether the court had authority to exclude the signature sheets is a question of law that we review de novo. *See Harris*, 219 Ariz. 36, ¶ 13, 192 P.3d at 165-66.

¶46 Section 19-112(A) governs the signing of petition signature sheets and requires, inter alia, that the qualified elector "print his first and last names and write, in the appropriate spaces following the signature, the signer's residence address, giving street and number,

and if he has no street address, a description of his residence location." Each petition signature sheet must be accompanied by an affidavit signed by the circulator, avowing that the signer has complied with § 19-112(A). *See* § 19-112(C). Section 19-121.01(A)(3)(f) requires the Secretary of State, or in this case the City Clerk, to mark as ineligible for verification any signature "for which the secretary of state determines that the petition circulator has printed the elector's first and last names or other information in violation of § 19-112."

**¶47** We disagree with the Committee's contention that a trial court is limited to this remedy under the circumstances presented here. Section 19-121.01(A) describes the procedure to be used and the sheets and signatures subject to removal by the Secretary of State for various faults in the signatures and/or petition sheets. It does not purport to limit the remedies available to a trial court and, critically, does not address the issue of fraudulent affidavits. Our supreme court made clear in *Brousseau v. Fitzgerald*, 138 Ariz. 453, 456, 675 P.2d 713, 716 (1984), that "petitions containing false certifications by circulators are void, and the signatures on such petitions may not be considered in determining the sufficiency of the number of signatures to qualify for placement on the ballot." The circulator affidavits on the petition sheets used here stated, among other things, that "each individual printed the individual's own name and address." Because the petition circulators avowed that each signer wrote his or her own address, and the evidence demonstrated that avowal was false, the signature sheets are void pursuant to the rule announced in *Brousseau*.

**¶48** The Committee further argues, however, that our supreme court abrogated the *Brousseau* rule in *Ross v. Bennett*, 228 Ariz. 174, 265 P.3d 356 (2011). The Committee misreads *Ross*. There, the court rejected the argument that *Brousseau* required the trial court to strike signature sheets "because the county recorder could not certify individual signatures on them." *Ross*, 228 Ariz. 174, ¶ 34, 265 P.2d at 362. The court clarified that omissions and irregularities did not require an entire signature sheet to be discarded and that *Brousseau* did not "stand for the proposition that the Court should disqualify all petitions with affidavits based on any false information." *Ross*, 228 Ariz. 174, ¶ 36, 265 P.3d at 363. Instead, the court explained, although the signature sheets "may contain some signatures from electors who

are not qualified to vote," that did not mean "the circulator's oath was itself fraudulent" because there was no evidence the circulators were aware the electors were not qualified and "[f]raud requires an element of knowledge—a guilty mental state." *Id.* ¶ 37. Here, in contrast, the circulator's affidavit was necessarily false. It was apparent from the signature sheets that the elector did not print his or her own address—a fact the circulator must have known if the affidavit's statement that each elector filled out the signature sheet "in my presence on the date indicated" were true. The false affidavits rendered the signature sheets void. *Brousseau*, 138 Ariz. at 456, 675 P.2d at 716.

### 6.     Amended Complaint

**¶49**      The Committee further claims the trial court improperly permitted the Employees "to amend their pleadings during trial" to challenge Gordon's residency status. On the first day of the evidentiary hearing, the court heard testimony from Carol Zimmerman, the political consultant hired by the Committee to organize and supervise the petition circulators. During cross-examination, counsel for the Committee asked Zimmerman about Laws's "living arrangements." She testified that Laws had "traveled" with Gordon and that Gordon "is also registered at that address in Phoenix." On the second day of the hearing, counsel for the Employees asked Chavez about Zimmerman's testimony concerning Gordon, and Chavez confirmed Gordon was a paid circulator who had traveled from California to Arizona with Laws. Chavez further stated that Gordon's affidavit claiming she lived at the Phoenix address was not "a truthful statement." The Committee did not object to this testimony. During cross-examination, counsel for the Committee asked Chavez about "property" owned by Gordon. When the Employees sought admission of signature sheets circulated by Gordon, however, the Committee objected, stating it opposed the use of the exhibit "for the purpose of trying to amend the Complaint and adding another allegation to it."

**¶50**      The Employees agreed they were seeking to amend their complaint to include a claim that Gordon was ineligible to serve as a circulator and argued, "this is an area that was opened up by the Committee in the questioning of their own witness [Ms. Zimmerman]" because she had offered the Phoenix address "as proof of Ms. Gordon's

location" and the Employees' "research[]" showed Gordon did not live there. The Committee responded that it did not "know what that research is," that there had not been "a witness to testify as to that research," and that it "is very late in the process to bring in" a claim related to another circulator. The trial court, noting that amendments should be liberally granted and that a pleading can be amended to conform to the evidence presented, overruled the Committee's objection.

**¶51**     Rule 15(b), Ariz. R. Civ. P., automatically amends pleadings to "conform to the evidence" and to raise additional issues "[w]hen [such] issues . . . are tried by express or implied consent of the parties." However, the pleadings still may be amended even when a party objects to evidence related to the new issue "on the ground that it is not within the issues made by the pleadings." *Id.* A trial court is required to permit such an amendment "when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits." *Id.* "Failure to object to the introduction of evidence on the ground that it is not within the issues is sufficient to imply consent to try such issues." *In re Estate of McCauley*, 101 Ariz. 8, 18, 415 P.2d 431, 441 (1966). "Permitting evidence relevant to an existing issue to be admitted without objection does not constitute 'implied consent' to trial of an issue which has not been raised." *Magma Copper Co. v. Indus. Comm'n*, 139 Ariz. 38, 47, 676 P.2d 1096, 1106 (1983). An amendment nonetheless is permitted absent a showing of "prejudice, i.e. surprise." *Estate of McCauley*, 101 Ariz. at 18, 415 P.2d at 441. We review the trial court's decision to permit amendment of the pleadings under Rule 15(b) for an abuse of discretion.[16] *Bujanda v. Montgomery Ward & Co.*, 125 Ariz. 314, 315, 609 P.2d 584, 585 (App. 1980).

---

[16]The Committee also argues that "Rule 15's 'liberal policy of amendment'" does not apply to election cases because it would have had no opportunity for additional discovery and "trial continuances are typically unavailable." The Committee did not raise this argument below nor did it suggest that a continuance would permit it to adequately contest the Employees' claim concerning Gordon's

¶52 The Committee contends it did not "open[] the door" to the issue whether Gordon was a qualified circulator because the evidence related to Gordon's address was introduced "to support an existing claim." We need not address this argument, however, because the Committee has not shown resulting prejudice. The amendment did nothing to change the Employees' theory of the case—the issue of non-resident circulators had been raised and thoroughly addressed by the parties. *See Bujanda*, 125 Ariz. at 316, 609 P.2d at 586 (amendment improper because it "would have changed the theory of the case"). And, the Committee cannot reasonably claim surprise, given that evidence was produced on the first day of the evidentiary hearing that Gordon was a circulator who claimed to live at the same address as and was in a relationship with Laws—whom the Employees had specifically identified as a non-resident circulator. Indeed, the Committee chose to use that evidence in an apparent attempt to bolster its defense of Laws's residency status by suggesting that Gordon and not Laws might have owned a condominium at the address both had listed. Thus, the Committee reasonably should have anticipated the Employees would assert Gordon was not a qualified circulator as well. Accordingly, we conclude the trial court did not err by permitting the Employees to amend their complaint to conform to evidence that Gordon was not an Arizona resident.[17]

### 7. Denial of Motion to Dismiss

¶53 Last, the Committee argues the trial court erred by denying its motion to dismiss the Employees' complaint because they

---

residency status. Thus, we do not address the issue further. *See Airfreight Express Ltd.*, 215 Ariz. 103, ¶ 17, 158 P.3d at 238-39.

[17]Because we conclude the Committee has not shown resulting surprise, we need not separately address its argument that the amendment violated its due process rights. *See Cook v. Losnegard*, 228 Ariz. 202, ¶ 18, 265 P.2d 384, 388 (App. 2011) ("'Due process entitles a party to notice and an opportunity to be heard at a meaningful time and in a meaningful manner.'"), *quoting Curtis v. Richardson*, 212 Ariz. 308, ¶ 16, 131 P.3d 480, 484 (App. 2006).

did not file it within the five-day time limit prescribed by § 19-122(A) and, in the alternative, did not timely seek mandamus relief pursuant to § 19-122(C) and § 12-2021. Pursuant to § 19-122(A):

> If the secretary of state refuses to accept and file a petition for the initiative or referendum, or proposal for a constitutional amendment that has been presented within the time prescribed, or if the secretary of state refuses to transmit the facsimiles of a signature sheet or sheets or affidavits of circulators to the county recorders for certification under § 19-121.01, the secretary of state shall provide the person who submitted the petition, proposal, signature sheet or affidavit with a written statement of the reason for the refusal. Within five calendar days after the refusal any citizen may apply to the superior court for a writ of mandamus to compel the secretary of state to file the petition or proposal or transmit the facsimiles.

¶54 Relying on *Transportation Infrastructure Moving Arizona's Economy v. Brewer*, 219 Ariz. 207, 196 P.3d 229 (2008) ("*TIME*"), the Committee argues, as it did below, that our supreme court held that the time limit prescribed by § 19-122(A) was "applicable to any challenge" to the Secretary of State's actions under § 19-121.01. Thus, the Committee concludes, although the Employees' claim was brought pursuant to § 19-122(C), the five-day time limit in § 19-122(A) nonetheless applies. Section 19-122(C) permits an action "by any citizen" to challenge a petition that is not legally sufficient and to "enjoin the secretary or other officers from certifying or printing on the official ballot for the ensuing election the amendment or measure proposed or referred." The subsection contains no express time limit for bringing that action.

¶55 Questions of statutory interpretation are reviewed de novo. *Mejak v. Granville*, 212 Ariz. 555, ¶ 7, 136 P.3d 874, 875 (2006). Here, the Committee's position is belied by the statutory language. *See*

*id.* ¶ 8 (statutory language best indicator of legislative intent). By its plain language, § 19-122(A) applies only to the Secretary of State's refusal to "accept and file" a valid initiative petition. The Employees' challenge here was precisely the opposite and is encompassed by the plain language of § 19-122(C).

¶56　　　　We find nothing in *TIME* that supports the Committee's argument and certainly nothing that suggests we should ignore the plain language of § 19-122. The Committee relies on portions of *TIME* that, when read in isolation, obliquely suggest that § 19-122(A) could apply to any challenge to the actions of the Secretary of State under § 19-121.01. But the Committee does not consider those portions of the court's decision in context and in light of the issues that were raised in that case and addressed by the court; the court in *TIME* simply did not discuss whether § 19-122(C) should be governed by the five-day limit in § 19-122(A). Indeed, the court cited with approval its decision in *Kromko v. Superior Court*, 168 Ariz. 51, 55, 811 P.2d 12, 16 (1991), in which the court expressly determined that the time limit in § 19-122(A) does not apply to a challenge under § 19-122(C). *TIME*, 219 Ariz. 207, ¶¶ 18, 28, 196 P.3d at 233-35.

¶57　　　　The Committee alternatively contends that the "principles enunciated in *TIME*" nonetheless required dismissal of the Employees' complaint. Specifically, based on *TIME* and *Kromko*, it asserts the Employees were required to challenge the City Clerk's calculations before the Clerk sent the petition sheets to the County Recorder to determine the error rate. The Committee is correct that our supreme court recognized and discussed the potential problems caused by the short timeframes often present in election challenges. *TIME*, 219 Ariz. 207, ¶¶ 33-35, 196 P.3d at 235-36. Thus, the court has determined that such actions cannot be unreasonably delayed. *Id.* ¶ 33; *see also Kromko*, 168 Ariz. at 57, 811 P.2d at 18 ("[D]isputes concerning election and petition matters must be initiated and heard in time to prepare the ballots for absentee voting to avoid rendering an action moot.").

¶58　　　　We agree with the trial court that there was no unreasonable delay here. The Employees filed their action nearly two months before the deadline for printing the ballots. *See Kromko*, 168 Ariz. at 57, 811 P.2d at 18 (challenge filed "more than a month and a

half before absentee voting began" timely). Although the Employees conceivably could have filed their action between two and three weeks earlier, after the City Clerk had issued its initial finding that some 22,000 signatures were eligible for verification, the Committee has identified no resulting prejudice. Moreover, despite the Committee's fears, there was time for thorough proceedings in both the trial court and before this court, and the Committee had the opportunity to seek review from our supreme court.

## DISPOSITION

**¶59** For the reasons stated, pursuant to this court's order dated September 12, 2013, the judgment is reversed.