NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

TREVOR SMITH, et al.,
*Plaintiffs/Appellees,*

*v.*

AFC GAMMA, INC., et al.,
*Defendants/Appellants.*

No. 1 CA-CV 24-0708

FILED 09-30-2025

---

Appeal from the Superior Court in Maricopa County
No. CV2023-009575
The Honorable Christopher A. Coury, Judge

**AFFIRMED**

---

COUNSEL

Snell & Wilmer, Phoenix
By Steven D. Jerome, Emily Gildar Yaron
*Counsel for Defendant/Appellants*

Barrett & Matura, P.C., Scottsdale
By Jeffrey C. Matura, Melissa J. England
*Co-Counsel for Plaintiffs/Appellees*

Coppersmith Brockelman PLC, Phoenix
By Gabriel R. Aragon, Andrew T. Fox
*Co-Counsel for Plaintiffs/Appellees*

---

## MEMORANDUM DECISION

Judge Andrew J. Becke delivered the decision of the Court, in which Presiding Judge David B. Gass and Judge Michael J. Brown joined.

---

**B E C K E**, Judge:

**¶1** AFC Gamma, Inc. and AFC Agent LLC (collectively, "Gamma") appeal the superior court's September 5, 2024 order ("Order"), incorporating its July 30, 2024 "Order Approving Receiver's Recommendation." Gamma argues the court erred when it adopted the Receiver's recommendation, imposing a constructive trust for more than $3.5 million in favor of Trevor Smith, Judah Holland, and Joseph Gimbel (collectively, "Smith") over funds to which Gamma asserted it had a perfected security interest. Gamma urges us to vacate the court's Order, asserting Smith did not litigate or prove any claims against Gamma, and the court deprived Gamma of due process. For the following reasons, we affirm.

## BACKGROUND

### I. Gamma Made a Loan to Devi Holdings. Inc., Secured by Some of Devi's Assets.

**¶2** In May 2020, Gamma filed a UCC-1 financing statement, creating a security interest in "[a]ll assets of [Devi Holdings, Inc.]" as collateral for a series of loans from Gamma to Devi. Gamma (among other lenders) and Devi entered into a credit agreement under which Devi received a loan of about $31 million. That same day, they also entered into a security agreement. The security agreement said the collateral did not include "any asset in which pledges and security interests are prohibited by Applicable Law, Cannabis Law, rule, regulation or Contractual Obligation or would violate or invalidate any lease, license or other agreement." Gamma and Devi later amended and restated the credit agreement several times, increasing Devi's total loan obligation.

**II.    Devi Agreed to Purchase Smith's Interest in a Cannabis Business.**

**¶3**        In November 2020, Smith entered a Membership Interest Purchase and Change of Control Agreement ("MIPA") with Devi. Devi agreed to purchase Smith's membership interests in ZLJT LLC, which gave Devi operational control[1] over Arizona Natural Pain Solutions, Inc. ("Pain Solutions").[2] The membership interests' purchase price was $9.5 million, consisting of $7 million in cash, and stock which the parties agreed had a value of $2.5 million.

**¶4**        Devi also agreed to pay Smith the stock's "agreed value," plus accrued interest, upon a "change of control." Section 1.2(d)(iv)(A) of the MIPA stated the following:

> In the event of a Change of Control described under Section 1.2(d)(ii) set forth above, [Devi] shall give [Smith] no less than thirty (30) days' notice of such proposed Change of Control (the "Change of Control Notice") and the cash and/or stock consideration such [Smith] would be entitled to receive in connection with such Change of Control transaction.

According to Section 1.2(d)(ii) of the MIPA:

> In the event that, prior to the Exercise Date (or after the Exercise Date until repayment in full pursuant to Section 1.2(c)(iv)), a Change of Control in which some or all of the consideration is non-cash consideration occurs, [Smith] shall have the option . . . to elect that (A) [Devi] pay [Smith] the Agreed Value plus an amount equal to twelve percent (12%) per annum of the Agreed Value, accruing each year from the Closing Date to the date immediately prior to such Change of Control.

---

[1] In November 2018, ZLJT and Pain Solutions entered into a Management Services Agreement, granting ZLJT the exclusive right to manage Pain Solutions and its business operations.

[2] The Arizona Department of Health Services granted Pain Solutions a certificate and license to operate a marijuana business in accordance with the Arizona Medical Marijuana Act (Arizona Revised Statute § 36-2801  to -2844).

The MIPA defined a "change of control" as any transaction between Devi and a third party in which the third party acquired operational control of Pain Solutions.

### III.    Devi Encountered Financial Difficulties and Began Selling Assets.

¶5        On March 1, 2023, Gamma and Devi amended their credit agreement, affirming that the schedules "specifically identified and attached in Annex A hereto hereby replace in their entirety the corresponding Schedules included in the Credit Agreement." Annex A listed the MIPA and a "put option" as "material contracts." The amended credit agreement specifically stated that the MIPA's put option "also contains certain change of control provisions that may trigger compensation upon the sale."

¶6        On May 17, 2023, Devi held its annual shareholders' meeting, which Smith attended. At that meeting, Devi announced it intended to sell its Arizona assets, including Pain Solutions, for $65 million. It also announced it was under financial distress, could not honor its financial obligations, and could not produce accurate financial statements.

¶7        On June 7, 2023, Smith sent Devi a letter notifying it of alleged defaults under the MIPA. In the letter, Smith recalled that, on June 2, 2023, Devi's chief legal officer, Maureen Watkins, informed Smith about the impending Pain Solutions transaction and admitted the transaction "would trigger the change of control provisions in the MIPA." Smith notified Devi the next day of Smith's election to receive payment for the $2.5 million agreed value plus the 12% accrued interest, under Section 1.2(d)(ii)(A), totaling about $3.3 million (as of June 30, 2023). After providing that background information, Smith's letter asserted that Devi had defaulted on four of its contractual obligations under the MIPA. Watkins acknowledged Smith's letter that same day and said Devi would respond in the coming days.

¶8 On June 15, 2023, Smith notified Story Cannabis Company LLC ("Story") that Smith had learned Story was interested in acquiring Pain Solutions. Smith informed Story that Devi's contractual obligation under the MIPA required Devi to pay Smith when a change of control of Pain Solutions occurred. That same day, Devi responded to Smith's June 7, 2023 letter, denying it had defaulted on any of its MIPA obligations. Devi contended that the MIPA allowed it "to explore an asset sale." Devi acknowledged that the MIPA established that Smith was conditionally entitled to payment and maintained that Smith's right to payment was not ripe because a change of control had yet occurred.

¶9 On June 20, 2023, Smith sought to confirm in writing that Devi "intend[ed] to fully comply with the Change of Control payment obligations" and to pay them the agreed value, "$3,296,438," no later than the Pain Solutions transaction's closing date.

¶10 On June 23, 2023, Smith filed suit against Devi, asserting Devi had breached the MIPA. Smith's Complaint sought contractual damages, injunctive relief, and declaratory judgment. Smith alleged that Devi had breached the MIPA by not notifying Smith of the change of control and by refusing to pay them the agreed value plus accrued interest before the change of control. Smith requested the court order Devi to pay the change of control amount before the transaction occurred and enjoin Devi from selling Pain Solutions to any buyer without honoring the change of control provision. Smith also requested damages and an award of attorneys' fees and costs.

## IV. Devi Sold Certain Assets, Including Pain Solutions, to Story Cannabis.

¶11 On June 30, 2023, Devi's board of directors entered into a Master Purchase and Regime Change Agreement ("MPRCA") to transfer certain assets, including Pain Solutions, to Story. Devi's board acknowledged they would use the transaction's proceeds to pay off Devi's debts. The MPRCA included the following provision:

> [W]hen Devi acquired the majority interest in [Pain Solutions] in November 2020, it entered into a MIPA with [Smith]. In pertinent part, the MIPA included a change of control provision whereby in the event of a change of control of either the license holding entity, the management company [], or the board of either entity, [Smith] could put the Devi shares they had acquired as part of the transaction to Devi for an agreed

price of $2.5m plus 12% interest (from the closing of the transaction until change of control date). Devi and Jigar Patel in his personal capacity guaranty payment of the put price although Devi's obligations are subordinate to its obligations under the [Gamma] credit agreement.

.   .   .

**This matter will be settled simultaneously with the closing of this transaction**.

(Emphasis added). On the same day, Gamma and Devi entered into a consent agreement, approving Devi's signing onto the MPRCA and the Pain Solutions sale to Story.

¶12        On August 3, 2023, Story announced in a press release that it had acquired Pain Solutions from Devi. A few days later, Devi's counsel admitted to Smith that (1) Devi completed the transaction with Story, (2) Devi had not and would not pay Smith because Gamma instructed Devi not to or else Gamma would sue Devi, and (3) Devi was actively trying to liquidate all its remaining assets.

## V.     Smith Had a Receiver Appointed over Devi.

¶13        On August 22, 2023, Smith amended its suit to add Gamma and Story as defendants, alleging that the failure to uphold the change of control provision at the transaction's closing "eviscerated" Smith's contractual rights. Smith claimed Gamma knew of the MIPA and its relevant provisions because it intentionally interfered with Devi's contractual obligation by instructing Devi to not honor the change of control provision. Smith did not serve Gamma.

¶14        In September 2023, Smith applied for the appointment of a receiver over Devi. Devi objected to the appointment of a receiver; Story did not.[3] In its reply, Smith emphasized that Devi did not deny breaching the MIPA, owing them about $3.5 million in debt, or actively liquidating and dissipating assets.

---

[3] We note that AFC did not take a position at the time because, although they were named as a defendant to the litigation, Smith only sent a copy of its application to Devi and Story.

¶15 On October 10, 2023, Gamma notified Devi of existing defaults under their credit agreement. In the default letter, Gamma accelerated the amounts due under the loan, demanding Devi to pay the loan's full amount (about $73 million). Gamma reserved all rights to the remedies under the credit agreement, including its rights as a secured creditor.

¶16 On November 1, 2023, the superior court appointed a receiver ("Receiver") over Devi with "all the rights and powers available to general receivers at common law and in equity" in accordance with Arizona Rule of Civil Procedure 66 and A.R.S. § 12-1241.

¶17 The court granted the Receiver authority to "manage, maintain, protect, and preserve the Receivership Entities"[4] throughout the receivership in a "reasonable, prudent, diligent, and efficient manner." The Receiver could enter into, modify, or terminate any agreement concerning the Receivership Entities. The court also prohibited all Receivership Entities' affiliates from collecting from, attempting to collect from, or exercising control over the Receivership Entities.

## VI. Gamma and Smith Agreed to a Process for Distributing Devi's Assets from the Receivership Estate.

¶18 On November 16, 2023, Gamma moved to modify the receivership order, making its first appearance in the case. Gamma noted it was never served and had not responded to Smith's complaint or application to appoint a receiver. Nevertheless, Gamma did *not* oppose the Receiver's appointment, believing it was "likely beneficial to all creditors." Gamma requested the order require the Receiver to fulfill Gamma's credit agreement obligations and asserted the court could not allow the Receiver to ignore any existing liens over the Receivership Entities. The court denied Gamma's motion without prejudice and requested the parties to meet and confer regarding the receivership order's modifications. The court stated it would entertain a renewed motion regarding any modifications upon which the parties could not agree.

¶19 After conferring, Gamma and Smith submitted a partially stipulated receivership order, and each offered their own proposed language for several subsections on which they could not agree. The court

---

[4] The Receivership Entities included "all the real, personal, and tangible and intangible property owned or controlled by Devi [] or any of its subsidiaries and affiliated companies . . . or in which [they] have an interest."

entered the parties' partially stipulated receivership order and chose from the parties' competing proposals on the limited provisions to which the parties did not agree. The court adopted Gamma's proposed language that any dispute between the parties "shall be subject to future resolution by the Court," any reserved funds should "remain in the possession of the Receivership estate," and all the Receiver's distributions "are subject to final approval by the Court or agreement of the Parties."

¶20            Smith requested an entry of default against Devi because of Devi's failure to answer their August 2023 amended complaint. The parties later stipulated that Devi owed Smith $3,452,804.95 for the change of control payment ("COC Payment") under the MIPA, and a judgment was entered in that amount. Smith then voluntarily dismissed its claims against Story.

¶21            On February 1, 2024, the court held a hearing regarding the amended receivership order. During the hearing, the court set forth the proposed receivership process: the Receiver would consider the asset, recommend a distribution (no less than 10 days from actual distribution), and, if a party objected to the distribution, then the court would determine what was to be distributed and to whom.

¶22            The court asked the parties to explain their positions and any disagreements with the amended order. Gamma's counsel stated, "I think we're in agreement with the amended order" and "we're happy with the amended order."

¶23            Gamma's counsel sought clarification regarding the process, particularly with respect to the distribution of proceeds from the pending sale of two pieces of Devi's real property. The court explained that (1) the Receiver would propose to whom the money would be distributed, and (2) if a party objected, then the court would rule on that objection. Gamma's counsel then stated Gamma "want[ed] the [R]eceiver or the Court to essentially order this, because at this point, there is no real objection to these two things that really deal with real estate."

¶24            Gamma's counsel reiterated Gamma's position that it retained a security interest in all remaining assets of Devi that were not real estate. Smith's counsel argued that it was undisputed that Smith was owed roughly $3.5 million, which should have been paid in August 2023 upon the change of control, but were not paid because Gamma took that money. Smith's counsel clarified that, while Smith still sought the COC Payment from the receivership estate, they acknowledged that because Gamma had

valid, recorded, deeds of trust on the two pieces of real property, then Gamma should receive the funds to satisfy those deeds of trust first.

¶25        Smith's counsel added that Gamma collected the COC Payment in August 2023 even though it knew (through its own agreements and schedules) the Pain Solutions transaction triggered the change of control provision. The court then entered an order, affirming the amended order appointing a receiver, and ordered the Receiver to pay Gamma for the lien amounts relating to the two real property sales.

¶26        The court then asked whether there was anything that needed addressing, and no party raised any relevant issue. A few days later, following the agreed upon process, the Receiver notified the parties that he had about $10 million of proceeds from the two real property sales. Gamma demanded the Receiver pay Gamma the proceeds in accordance with the amended receivership order, Smith did not object, and the Receiver paid Gamma.

## VII.    The Receiver Undertook a Detailed Factual Investigation and Made a Recommendation to the Court Regarding the COC Payment.

¶27        Following the February 1 hearing, the Receiver requested the parties provide him with "a detailed written discussion of their respective positions" regarding the COC Payment. Gamma and Smith submitted nearly 800 pages of documents supporting their positions. After reviewing the parties' submissions, the Receiver's counsel requested a face-to-face meeting with the parties, so their counsel could address all parties' positions. At the meeting, the parties gave the Receiver more documents to review. Devi also shared "various internal documents" and emails with the Receiver. The Receiver's counsel reviewed public records and asked the parties for "any substantive law that might resolve this dispute" but was provided nothing.

¶28        The Receiver and his counsel conducted interviews with Devi's employees and former employees for more clarity. The Receiver's counsel interviewed people involved with the transaction, including Maureen Watkins, who confirmed that "Smith was entitled to the change of control payment." The Receiver concluded that Smith relied on Watkins' representation in deciding not to block the Story sale.

¶29        The Receiver then drafted a written recommendation and asked the parties for their review and comment, particularly to address "whether the facts as presented . . . were correctly stated." The Receiver

9

noted that, because the parties did not share any legal authority addressing the issue, he and his counsel issued the recommendation "based upon their understanding on the facts before them."

**¶30**        On June 10, 2024, the Receiver filed his recommendation with the court addressing the distribution of the COC Payment from the receivership estate. The Receiver recommended the court impose a constructive trust over the receivership estate for the amount of the COC Payment in Smith's favor. Based on his review, the Receiver concluded that (1) Smith and Devi understood that Devi agreed to pay Smith the COC Payment as part of its transaction with Story, (2) Devi had not paid Smith, and (3) Gamma consented to Devi's payment to Smith. According to the Receiver, the MPRCA detailed what Devi was selling and required that certain encumbrances needed to be removed concurrently with the closing of the Pain Solutions transaction. The Receiver noted that Smith's "[e]ncumbrance was not properly removed."

**¶31**        The Receiver reviewed the Devi board's Unanimous Written Consent document approving the Pain Solutions transaction and determined that the funds of the transaction's closing should have been used to pay Devi's contractual debts—including the COC Payment. The Receiver explained that although the MPRCA's language stated that Devi's guaranty was "subordinate" to Gamma's credit agreement, he determined that the subordination related to Devi's guaranty obligations, not to Devi's "pre-existing contractual obligation" under the MIPA to pay Smith for the change of control. From the Receiver's perspective, the MPRCA agreed that Smith was entitled to the COC Payment, regardless of Devi's obligation to Smith being subordinate to its obligation to Gamma, because the MPRCA stated (in Schedule 3.5) that "[t]his matter will be settled simultaneously with the closing of this transaction."

**¶32**        The Receiver included two other facts relevant to the transaction. First, Gamma had notice and knowledge of the proposed payment to Smith using the receivership estate's assets, because Gamma had a "Board observer" witness the Devi board's unanimous vote to approve the MPRCA. The Receiver commented that the second fact was more compelling:

> [Gamma's] loan agreement with Devi required Devi to obtain [Gamma]'s consent to enter into a transaction such as the Story [transaction], and on June 30, 2023, [Gamma] and Devi entered into a Consent Agreement whereby [Gamma] approved the [] MPRCA. . . . Consequently, even though

[Gamma's] security interest was superior in priority to [Smith's] payment right, [Gamma] consented to the Smith payment by consenting to the [] MPRCA.

¶33　　　　A few days after the Receiver filed his recommendation, Gamma applied for substitution of counsel, which the court promptly granted. Gamma, through its new counsel, opposed the Receiver's recommendation and requested the court find Gamma was entitled to the Story transaction proceeds it had already received and that the Receiver and Smith could not "remove [its] liens on its remaining Collateral to pay [Smith's] unsecured claim." Gamma argued for the first time that, if the court followed the Receiver's recommendation, then it should have required Smith to sue Gamma before imposing any remedy. Gamma stated that if the court allowed Smith to collect the money without filing suit, it would "deprive [Gamma] of its due process rights." Smith supported the Receiver's recommendation and urged the court to adopt it.

## VIII.　The Superior Court Adopted the Receiver's Recommendation.

¶34　　　　After reviewing the Receiver's recommendation and the further arguments of counsel, the court issued an order approving the Receiver's recommendation. In that order, the court found that: (1) Devi was contractually obligated and agreed to pay Smith for the change of control in accordance with the MIPA, (2) Gamma was a secured creditor of Devi with respect to certain collateral, (3) Devi needed Gamma's consent to complete the transaction, (4) Gamma objected to Devi's payment to Smith, but (5) Gamma consented to the transaction when it signed the consent agreement to the MPRCA.

¶35　　　　The court rejected Gamma's procedural due process argument because Gamma consented to and actively participated in the receivership process, and because "principles of equity govern" the receivership process under Rule 66(c)(4). The court also explained that because the COC Payment was an expense connected with the sale of Pain Solutions, the COC Payment amount was neither Gamma's collateral nor net cash proceeds, meaning it never had a security interest in that amount. Because Gamma had directed Devi to not pay Smith at or after the transaction's closing, the court found the constructive trust was appropriate to prevent Gamma's unjust enrichment at Smith's expense.

¶36　　　　The court approved and adopted the Receiver's recommendation, and it ordered the Receiver to distribute the COC Payment to Smith. In November 2024, the court certified its Order, which

incorporated its July 30, 2024 order approving and adopting the Receiver's recommendation, under Rule 54(b). Gamma timely appealed, and we have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. § 12-2101(A)(4).

## DISCUSSION

**¶37** Gamma argues the superior court erred when it adopted the Receiver's recommendation imposing a constructive trust over more than $3.5 million in Smith's favor. Smith, however, contends that Gamma's arguments essentially seek to back out of an agreement it made regarding how the receivership would be handled. We agree with Smith.

**¶38** The superior court "may appoint a receiver to protect and preserve property or the rights of parties therein, even if the action includes no other claim for relief." A.R.S. § 12-1241. The court has broad authority to control claims brought against a receivership estate, and the principles of equity govern whenever applicable. *Hiatt v. Shah*, 238 Ariz. 579, 582, ¶ 7 (App. 2015); *accord* Ariz. R. Civ. P. 66(c)(4). The court has discretion to determine whether to fashion an equitable remedy, and we will not disturb its decision absent an abuse of discretion. *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, 409, ¶ 106 (App. 2012).

**¶39** A court can impose a constructive trust when title to property was obtained through actual fraud, misrepresentation, concealment, or similar means, including a breach of fiduciary duty. *Id.* at 409, ¶ 107. "A constructive trust arises by operation of law rather than agreement and will be imposed when circumstances resulting, or likely to result, in unjust enrichment make it inequitable that the property should be retained by the one who holds the legal title." *Id.*; *see also Harmon v. Harmon*, 126 Ariz. 242, 244 (App. 1980) ("A constructive trust is a remedial device created by courts of equity to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs."). Because a constructive trust's imposition is an equitable remedy, "no set or unyielding formula exists for a court to impose one." *Cal X-Tra*, 229 Ariz. at 409, ¶ 108.

## I. The Superior Court Did Not Violate Gamma's Substantive or Procedural Due Process Rights.

**¶40** Gamma argues the court violated its substantive and procedural due process rights through the receivership process. We disagree.

### a. Gamma's substantive due process claim fails.

**¶41** Gamma asserts a substantive due process violation in the superior court's order, reasoning that its adoption of the Receiver's recommendation improperly "stripped" its lien in violation of Gamma's property rights in its collateral, which Gamma insists encompasses the entire receivership estate. This is simply incorrect.

**¶42** Gamma's UCC-1 filing statements did not list Pain Solutions or any cannabis entity as Gamma's collateral. Gamma's collateral did not include cannabis inventory, a cannabis license, or any real property used to sell cannabis. Nor did it include pledges or security interests that would have violated state-authorized licenses. The Arizona Department of Health Services, for example, did not consent to Gamma having a security interest in Pain Solutions.

**¶43** The court found that Devi's obligation to pay Smith for the change of control "constituted an expense related to . . . the sale or disposition of [Pain Solutions]." Because the court found that the change of control's amount was not "net cash proceeds" from the transaction, Gamma "never had a security interest" in those funds. Gamma's credit agreement with Devi defined "net cash proceeds" as the amount of cash proceeds that Devi received, *except* "reasonable fees, commissions, and expenses related thereto and required to be paid by [Devi] in connection with such sale or disposition."

**¶44** Gamma's security interest only attached to "net cash proceeds" from the Story transaction *after* the COC Payment to Smith. Because the COC Payment was a contractual obligation under the MIPA, not "net cash proceeds" from the Pain Solutions transaction, Gamma's security interest did not attach to those funds. The court did not violate Gamma's substantive due process rights. There could be no interference with a right or property interest that Gamma did not have.

### b. Gamma's procedural due process claim is waived.

**¶45** Gamma argues the court erroneously granted a constructive trust without first requiring Smith to formally plead and prove claims through traditional litigation proceedings. The superior court found that "[Gamma] agreed to the [receivership] process," waiving its procedural argument. The court emphasized that "[Gamma] actively participated in the intensive fact-finding process. We agree.

¶46 At the February 1, 2024 hearing, Gamma's counsel stated, "we're happy with the amended [receivership] order," and "we want the [R]eceiver or the Court to essentially order this." The Receiver's detailed factual investigation then followed.

¶47 Gamma was content to follow the process set forth in the receivership order so long as the result was to its benefit. Once the Receiver recommended a remedy not in its favor, however, Gamma claimed the process violated its rights. *See Mashni v. Foster ex rel. Cnty. of Maricopa*, 234 Ariz. 522, 528, ¶ 19 (App. 2014) ("Like the court itself, the receiver is a neutral whose actions may redound to the benefit of some and the detriment of others."). We agree with the court that Gamma elected to actively participate in the proposed receivership process rather than pursue traditional litigation. *See Industrial Park Corp. v. U.S.I.F. Palo Verde Corporation*, 19 Ariz. App. 342, 344 (App. 1973) (affirming Arizona courts look favorably "upon stipulations designed to simplify and settle litigation"); *accord Crunden-Martin Mfg. Co. v. Christy*, 22 Ariz. 254, 260 (1921) ("Courts look with favor upon stipulations designed to simplify and settle litigation."); *see also Pulliam v. Pulliam*, 139 Ariz. 343, 345 (App. 1984) (observing counsel may stipulate to procedural, evidentiary matters such as the admission of evidence and the law favors stipulations "because they reduce the time of trial and narrow the issues"); *cf. Gullett ex rel. Estate of Gullett v. Kindred Nursing Centers W., L.L.C.*, 241 Ariz. 532, 536, ¶ 8 (App. 2017) ("[B]y agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.") (citation and internal quotations omitted). Gamma's agreement to and active participation in the process waives any argument that a different process should have been employed.

¶48 Although Smith did not formally amend its pleadings to assert a constructive trust claim against Gamma, Rule 15(b)(2) provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if it had been raised in the pleadings." *See also Parker v. City of Tucson*, 233 Ariz. 422, 439, ¶ 51 (App. 2013) (affirming Rule 15(b) automatically amends pleadings to conform to the evidence and to raise additional issues when such issues are tried by the parties' express or implied consent); *accord In re McCauley's Estate*, 101 Ariz. 8, 17 (1966). "Failure to object to the introduction of evidence on the ground that it is not within the issues is sufficient to imply consent to try such issues." *Parker*, 233 Ariz. at 439, ¶ 51 (quoting *In re McCauley's Estate*, 101 Ariz. at 18).

**¶49** Gamma knew of Smith's claim well before the Story transaction closed. It knew Smith sought to collect the COC Payment from the receivership estate. After the transaction closed, Smith filed suit against Devi and amended its suit to include Gamma and Story as defendants. Smith moved to appoint a receiver, and, although Gamma was not served, Gamma never objected to Smith's motion. It only moved to modify the receivership order. With full knowledge of the nature of Smith's claims, Gamma agreed to the receivership process, which included a non-traditional process for presenting evidence, sharing documents, and arguing positions. Gamma's conduct throughout the receivership process constitutes implied consent to that process. *See Wallin v. Scottsdale Plumbing Co.*, 27 Ariz. App. 591, 594 (App. 1976) (Where an issue was raised and litigated by the parties, "there can be no claim of surprise and the [superior] court properly considered this issue."). The superior court did not violate Gamma's procedural due process rights.

**II.     The Superior Court Did Not Exceed the Scope of the Parties' Stipulated Receivership Process.**

**¶50** Gamma argues the court went beyond the scope of the parties' stipulated receivership process when it imposed a constructive trust remedy in Smith's favor, to which Gamma did not consent. Gamma explains the parties only agreed that, whenever the Receiver sold an asset, he could recommend how the sale proceeds should be distributed, and it did not agree the Receiver could "adjudicate claims" and "award remedies."[5]

**¶51** Gamma's argument ignores the course of conduct between Gamma and Smith immediately following the February 1, 2024 hearing. Both parties knew Smith sought the COC Payment. Both parties sought the Receiver's recommendation about whether it should be made from the receivership estate. Gamma was aware Smith did not receive payment at the Pain Solutions transaction's closing. Gamma was aware of that fact because it caused it to occur. Gamma was fully aware that Smith sought an

---

[5] We note that the Receiver only made a recommendation to the court. The court adjudicated the claim and awarded the remedy. *See* Ariz. R. Civ. P. 66(c)(1) (a receiver may perform duties and take actions "subject to the court's control and supervision"); *see also Hiatt*, 238 Ariz. at 582, ¶ 7 (stating the court has the discretion to fashion a remedy); *Mashni*, 234 Ariz. at 527, ¶ 19 (affirming a receiver acts under the appointing court's authority); *Gravel Res. of Ariz. v. Hills*, 217 Ariz. 33, 38, ¶ 14 (App. 2007) (stating we are "bound by the [superior] court's findings of fact," not those of a receiver).

order that the COC Payment was payable from the assets of the receivership estate.

¶52　　The constructive trust was merely the mechanism by which the court provided Smith with its remedy, a remedy that Gamma was fully aware Smith was seeking. With that knowledge, Gamma chose to participate in the receivership process. Gamma's substitution of counsel cannot change the fact that the Receiver's recommendation and the superior court's adoption of that recommendation were a product of Gamma's agreement to the process. *See Pulliam*, 139 Ariz. at 346 ("A stipulation made by previous counsel does not evaporate upon the retention of a new attorney."). The court did not abuse its discretion when it adopted the Receiver's recommendation to impose the equitable remedy of constructive trust in favor of Smith.

### III.　The Superior Court Did Not Deprive Gamma of the Opportunity to Present Evidence and Argue Its Positions When It Adopted the Receiver's Recommendation.

¶53　　Gamma argues it did not waive the right to proceed with traditional legal proceedings. But as discussed above, Gamma agreeing to the receivership process waives this argument.

¶54　　The parties—including Gamma—requested the Receiver to provide the court with a recommendation on which of the two should receive the COC Payment, and the Receiver did so. The Receiver reported a "process was immediately set up to obtain as much available information, as quickly as possible, to allow for an informed recommendation." The Receiver requested the parties to give him "a detailed written discussion of their respective positions," and they gave him nearly 800 pages of documentary support. Gamma made no argument that the Receiver prevented it from offering any evidence or arguing its position until after the Receiver's recommendation was filed. No party requested that the Receiver conduct its investigation following the traditional pre-trial litigation process. Gamma made no request to conduct traditional discovery or set traditional depositions.

¶55　　After reviewing what the parties shared with him, the Receiver's counsel requested a face-to-face meeting with the parties, so their counsel could address all parties' positions. Again, none of the parties requested that the Receiver conduct this meeting differently. In fact, the Receiver accepted additional documents during the meeting. The Receiver and his counsel conducted informal interviews, but no request was made

to require these interviews to be done formally or through a deposition proceeding.

¶56      A receiver acts as a "ministerial officer of the court" under the court's authority and does not promote any specific party's interest. *Mashni*, 234 Ariz. at 527, ¶ 19. A receiver's "duty is fidelity to the court and its orders." *Id.* at 528, ¶ 19. The court ordered the Receiver to recommend a distribution of the receivership estate, and the Receiver diligently performed its duty by conducting a thorough factual investigation, allowing Gamma and Smith to present as much information as they wished. The Receiver allowed the parties to review and comment on his understanding of the facts. Gamma agreed to and actively participated in this entire process. Any argument Gamma could make regarding the process employed is waived. Gamma was not deprived of its right to participate in traditional legal proceedings.

## IV.    The Superior Court Did Not Abuse Its Discretion in Concluding Gamma Did Not Have a Security Interest in the COC Payment.

¶57      Gamma argues it did not waive its lien on its collateral regarding the Story sale, because Gamma only consented to the sale on the condition that Smith would not be paid from its proceeds. Gamma asserts Devi's investment banker acknowledged Gamma's objection by removing the COC Payment to Smith from the amounts that were to be paid from the transaction proceeds as detailed in a flow of funds summary. Gamma also argues the court carelessly adopted the Receiver's recommendation out of "some ill-defined sense of 'fairness' and 'equity'" to Smith, and counters that there is nothing unfair or inequitable about Gamma's secured interest being paid before Smith's unsecured interest.

¶58      The court's findings, however, tell a different story. The court found that Devi prepared a summary of debts in anticipation of the Story transaction, which originally listed the COC Payment as a debt to be paid. The initial proposal would have paid Smith, but Gamma demanded that the COC Payment be removed, and Devi's agent yielded. Smith was never notified of Gamma's demand or copied on the summary. Gamma signed the consent agreement approving the sale only after the COC Payment was removed. The court ultimately found that awarding Gamma the COC Payment "would be unjust, inequitable and unconscionable," particularly when Gamma received over $49 million from the transaction, while Smith received nothing. We agree.

¶**59**     The court found that the MIPA required Devi to pay Smith the COC Payment as part of the sale of Pain Solutions to Story. The court also found that the COC Payment was never considered "proceeds" of the Story transaction or Gamma's collateral because of Devi's pre-existing contractual obligation to pay Smith the COC Payment at the time of the transaction. Because Devi failed to fulfill its contractual obligation to pay Smith on the transaction's closing date, the parties stipulated to the receivership process to alternatively resolve their dispute over who was entitled to the COC Payment. Gamma mistakenly believed that the COC Payment's amount sitting in the receivership estate was sales proceeds, to which their security interest attached, but that amount never belonged to Gamma or Devi. The amount belonged to Smith. Gamma argues it did not consent to Devi paying Smith the COC Payment under the MIPA and that it only consented to Devi entering the MPRCA. But, in fact, the MPRCA included explicit language that it would settle the MIPA's change of control provision "simultaneously with the closing of this transaction."

¶**60**     Gamma's interference with the COC Payment to Smith was unconscionable particularly when (1) Smith and Devi already contracted that Devi would pay Smith the COC Payment, (2) Devi promised, 10 days before the MPRCA and the consent agreement, to pay Smith the COC Payment, upon which Smith relied, and (3) Devi entered into the MPRCA, which included instructions to settle the COC Payment. Gamma's demand that Devi's agent remove the COC Payment from the debt summary without notifying Smith was unjust. The court's imposition of a constructive trust in these circumstances was well within its discretion. *See Cal X-Tra*, 229 Ariz. at 409, ¶ 107 (holding a court may impose a constructive trust, "a flexible, equitable remedy," when a party obtained title to property through unjust means or breached a fiduciary duty, or in other circumstances where conscience demands).

## V.     We Grant Attorneys' Fees and Costs to Smith.

¶**61**     Each party requests attorneys' fees incurred on appeal under A.R.S. § 12-341.01, which permits a discretionary award to the successful party in an action arising out of a contract. Both parties agree that this matter arises from a contract. Because Gamma is not the successful party, we deny its request. In our discretion we award Smith reasonable attorneys' fees and taxable costs subject to compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

¶62    We affirm.



MATTHEW J. MARTIN • Clerk of the Court

**FILED**:            JR